**SAMIA TARIQ-FAROOQ**,

*Plaintiff,*

v.

**VALLEY STREAM CENTRAL HIGH SCHOOL DISTRICT**;

**WAYNE R. LOPER**, Ed.D., individually and in his official capacity as Superintendent of Schools;

**ROBIN SMALL**, Ed.D., individually and in her official capacity as Principal of Valley Stream North High School;

**ELIZABETH SWINTON**, individually and in her official capacity as ENL Department Chair;

**KELLY WHITNEY-RIVERA**, Ed.D., individually and in her official capacity as District Director of Guidance and Chief Information Officer;

**JENNIFER BUONASPINA**, individually and in her official capacity as Assistant Principal for Pupil Services;

**LINO BRACCO**, individually and in his official capacity as Assistant Principal;

**CHARLES LOISEAU**, individually and in his official capacity as Assistant Principal;

**FABIAN JARA**, individually and in his official capacity as Assistant Principal; and

**JOHN AND JANE DOES 1-10**, individually and in their official capacities,

*Defendants.*

Civil Action No.


**VERIFIED COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS, DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES**


**JURY TRIAL DEMANDED**

<u>**PRELIMINARY STATEMENT**</u>

1. On the last week of Ramadan 2026, Valley Stream Central High School District escorted Samia Tariq-Farooq out of the school building she had served for three years, took her identification badge and her laptop, and told her not to come back. She had no disciplinary record. She had never been formally warned. She had never been written up. On the same day she was forced out, her replacement — a white, non-Muslim woman who had previously worked as a teaching assistant in the District — was already at the school and ready to take her place. And on that same day, the District cancelled the Islamic student prayer accommodation Ms. Tariq had overseen, a program she had maintained at administrators' request across multiple school years, a program whose students learned it was gone during the holiest days of their religious calendar.

2. This did not begin the day she was walked out. It began the day she was hired.

3. Ms. Tariq is a Pakistani Muslim woman who came to this country as an infant and has been an American citizen since the age of two. She speaks four languages fluently: English, Urdu, Punjabi, and Hindi, in addition to some Bengali. Valley Stream recruited her specifically because it needed a counselor who could communicate with the South Asian and immigrant families whose children filled the English as a New Language ("ENL") caseload at Valley Stream North, a school where approximately thirty percent of students are South Asian and which draws immigrant students from surrounding communities for specialized English language services. She was offered the position, she was told, largely because of her language skills. Because of her background. Because of who she was.

4. When colleagues learned that a new Pakistani Muslim counselor named Samia Tariq-Farooq had been hired, some of them told her later they wondered whether she would even

be able to speak English. Not because they had any information suggesting she could not. Because of her name, her nationality, and her religion.

5.      When she arrived, she was good at her job. Over three years, not a single student or parent filed a complaint against her. She organized Islamic prayer accommodations for Muslim students. She spoke Urdu and Punjabi to families who had no other professional in the District who could reach them in their own language. But certain administrators watched her differently. When she translated for South Asian or Muslim families, the translation itself was regarded with suspicion, as though bridging a gap that would otherwise have left a family voiceless was evidence of divided loyalty rather than professional skill.

6.      The suspicion quickly became explicit. In November 2023, a newly enrolled 12-year-old Pakistani girl drew a picture of an American flag with an X through it and a plane pointing toward a Pakistani flag. Administrators were prepared to refer the child to social services for a terroristic threat. Ms. Tariq intervened, spoke to the student in Urdu, understood the drawing for what it was — a child expressing what it felt like to miss her home country — and resolved it without traumatizing an already scared seventh grader. This was exactly the kind of situation for which she had been hired. What she received in response was a comment from Assistant Principal Jennifer Buonaspina, who told her that people at the school were understandably "on edge" because of "everything that's going on," and then said: "You know, Hamas is a terrorist organization." Directed at a Pakistani Muslim woman. In a professional workplace. By a supervisor. Ms. Tariq responded: "I know. But I'm Pakistani, not Palestinian. Why are you telling me that?" Buonaspina told her the guidance secretary had informed her about two five-year-old, reshared Facebook posts still appearing on Ms. Tariq's deactivated account, one of which was a news item about the murder of several Palestinians and the other an

Obama speech stating Muslims are not all terrorists. This implicit answer, delivered repeatedly over the following three years, was: because you are Muslim and Pakistani, and in this building, that is enough.

7. The scrutiny of her work intensified. When she relayed Muslim and South Asian ENL students' concerns that their ENL curriculum had focused on September 11 for two consecutive years — a focus her students experienced as singling them out and associating their communities with terrorism — administrators responded to her advocacy not with concern for the students but with heightened suspicion of her. When she was out sick for two days, Buonaspina directed colleagues to review her student transcripts. Not any other counselor's, only hers. When Ms. Tariq successfully overcame each complaint with documentation of the ENL international transcript conversion process, Buonaspina was subsequently removed from supervisory authority over the guidance department, the District's own implicit acknowledgment that the targeting was improper. But the damage was done, and the District would later use the fruits of this targeted scrutiny as pretextual grounds for Ms. Tariq's termination.

8. Then came the directive. In 2025, ENL Department Chair Elizabeth Swinton created a list of all ENL students and directed counselors to create a Major Life Event Exemption form for every listed student in their caseload. The forms would be held in reserve and processed automatically — without parent request, without explanation of alternatives, without the pre-approval required by NYSED — if the student failed the June Regents examination. If a student failed, the exemption would be submitted on their behalf, and a permanent exemption notation would be added to their official academic transcript on the basis of presumed fear of deportation. Colleges would see the exemption. Competitive programs would question it.

4

Families would sometimes call Ms. Tariq months later, after their children had graduated, to ask what the E on the transcript meant.

9.      The premise was as offensive as the implementation was unlawful. The directive assumed that ENL students — students who spoke Punjabi, Urdu, Hindi, Bengali, Pashto, Spanish, or Haitian at home, students with names that sounded foreign to the administrators issuing it — were presumptively undocumented, presumptively afraid, presumptively at risk of deportation. It did not ask. It did not wonder. It presumed. Many of Ms. Tariq's students were United States citizens. Many held green cards, lawful visas, or refugee status. The idea that they should be profiled by language background and deemed unable to pass the Regents exam — something no administrator considered doing to any student whose parents did not speak a foreign language at home — was not student support. It was the institutional expression of the same assumption that had caused colleagues to wonder, before Ms. Tariq arrived, whether she would be able to speak English.

10.      Ms. Tariq put her objection in writing and refused. In a meeting attended by Defendant Swinton, Defendant Whitney-Rivera, and others, Whitney-Rivera told her: "You have some nerve sending me an email like that. You don't follow directives. If you were asked to do something, you should have just done it." Whitney-Rivera told her: "You're not even tenured and you have the audacity to send an email like this." All three counselors who refused were threatened with formal disciplinary letters. Ms. Tariq quietly arranged for some students to have access to summer school and examination retakes as she would under normal circumstances, and she referred the rest to the administrators who forced the issue. She documented everything. She reported everything.

11. What followed was a coordinated institutional effort to construct a record justifying her removal. The guidance department stopped speaking to her entirely, with the stated backing and encouragement of administrators, led by Buonaspina. Colleagues were pressured to file complaints against her. Facebook posts from 2018, including a repost of President Obama saying not all Muslims are terrorists, and a post about Palestinian civilians, were excavated from before her employment and presented as evidence of unfitness. The District had known about those posts when it hired her. No one mentioned them until after she refused the directive and made a discrimination complaint. When her supervisor misidentified Ms. Tariq and the students she served as Middle Eastern and she corrected it explaining she is South Asian, Pakistani, the correction was filed as a complaint against her for rudeness.

12. On March 9, 2026, Ms. Tariq submitted her final formal retaliation report to Superintendent Loper with five exhibits. Two days later, the District hand-delivered a letter recommending her termination, citing scheduling questions and a grading inquiry from 2023, and a college application matter, incidents that were not caused by Ms. Tariq, had never resulted in any discipline, that the District had told her were outside the scope of its investigation, and that no reasonable employer would use to terminate an employee with no prior disciplinary history.

13. On July 9, 2026, three months after Ms. Tariq was publicly escorted out of the building, District Director of Guidance Kelly Whitney-Rivera stood before the Board of Education and presented the Major Life Event Exemption program to the public, innocently describing how she enacted the program that, when questioned by the only Muslim counselor in the building, had resulted in the destruction of that counselor's career. Ms. Tariq was not in the room. Her desk was occupied by someone else.

14.     This case is about what Valley Stream Central High School District could not see, or would not see, about its own assumptions: that immigrant students speaking foreign languages at home are probably undocumented; that a professional with a Pakistani name probably cannot speak English; that a Muslim woman's opinions about Palestine are probably a security concern; that a school counselor who speaks Urdu to a parent is probably doing something suspect; that a Pakistani woman who corrects a misidentification of her own ethnicity is probably being difficult. These assumptions ran through this District's treatment of Samia Tariq-Farooq from the day she was hired. She named them. She documented them. She refused to act on them when they were directed at her students. And the District, having been shown a mirror it did not want to look into, decided it would be easier to terminate the person holding it.

15.     Plaintiff brings this action under 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act of 1964, and 42 U.S.C. § 1981, against Valley Stream Central High School District and the individual administrators who directed, ratified, and carried out her removal. She seeks compensatory and punitive damages, declaratory and injunctive relief, reinstatement or front pay, restoration of her tenure track or equivalent tenure designation, a name-clearing hearing, attorneys' fees, and all other relief to which she is entitled. Plaintiff has filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission and intends to amend this Complaint to add her Title VII claims upon receipt of a Notice of Right to Sue. Her state law claims under the New York State Human Rights Law and New York Labor Law § 740 will be added by amendment upon completion of the pending General Municipal Law § 50-h examination, started but continued indefinitely by Defendants.

**JURISDICTION AND VENUE**

16. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as this action arises under 42 U.S.C. §§ 1981 and 1983 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.

17. This Court has supplemental jurisdiction over any state law claims that may be added by amendment pursuant to 28 U.S.C. § 1367(a).

18. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because Defendants reside and conduct business in Nassau County, New York, and because all events giving rise to this action occurred in Nassau County, New York, within this District.

**PARTIES**

19. Plaintiff Samia Tariq-Farooq is a Pakistani Muslim woman who was born in Pakistan and has been a United States citizen since the age of two. She resides in Nassau County, New York. She was employed as a school counselor by Valley Stream Central High School District at Valley Stream North High School, 750 Herman Avenue, Franklin Square, New York 11010, from approximately September 2023 until her administrative removal in March 2026. Her employment contract officially ended around June 26, 2026. In her role, she served about 150 students, most of whom were English as a New Language ("ENL") learners. Plaintiff is fluent in English, Urdu, Punjabi, and Hindi, and conversational in Bengali, making her the only school counselor in the District capable of communicating directly with a significant portion of its South Asian immigrant student population in their native languages. Plaintiff was recruited to the position in part because of these linguistic and cultural capacities.

20. Defendant Valley Stream Central High School District (the "District") is a public central high school district organized and existing under the laws of the State of New York, with its administrative offices located at One Kent Road, Valley Stream, New York 11580. The District operates four secondary schools: Valley Stream Central High School (grades 10-12), Valley Stream North High School (grades 7-12), Valley Stream South High School (grades 7-12), and Valley Stream Memorial Junior High School (grades 7-9). The District serves approximately 4,700 students, of whom approximately 90 percent identify as students of color. The District's student population is approximately 30.1 percent Black, 31.2 percent Hispanic or Latino, 22.9 percent Asian or Pacific Islander, and 12.9 percent white. Roughly 30 percent of the District's student body identifies as South Asian. The District receives federal financial assistance, including Title I funds. The District is a municipal entity subject to suit under 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964.

21. Defendant Wayne R. Loper, Ed.D., is and was at all times relevant to this Complaint the District's Superintendent of Schools. As Superintendent, Dr. Loper is the District's chief executive officer and final policymaker for all employment decisions, including personnel actions at the school level. Dr. Loper personally issued the termination recommendation against Plaintiff on March 11, 2026, issued the administrative reassignment order removing Plaintiff from the school on March 13, 2026, conducted the Stage II discrimination appeal, and received and failed to act on Plaintiff's multiple documented reports of discrimination and retaliation. Dr. Loper is sued in his individual and official capacities.

22. Defendant Robin Small, Ed.D., is and was at all times relevant to this Complaint the Principal of Valley Stream North High School. As Principal, Dr. Small is the chief administrator of the school and exercises supervisory authority over all school staff, including

9

school counselors. Dr. Small issued the Notice of Meeting dated February 10, 2026, warning Plaintiff that she might be subjected to disciplinary action, and participated in the February 11, 2026 disciplinary meeting as one of three administrators present. On March 13, 2026, she stated to Plaintiff that the decision to remove her from the building was "a District decision." Dr. Small participated in the adverse employment actions against Plaintiff described herein and is sued in her individual and official capacities.

23. Defendant Elizabeth Swinton is and was at all times relevant to this Complaint the District's ENL Department Chair. As ENL Department Chair, Ms. Swinton exercises supervisory authority over the District's English as a New Language program and the counselors assigned to serve ENL students. Ms. Swinton participated in the scrutiny of Plaintiff's student transcripts while she was out sick and the subsequent interrogation incorrectly accusing Plaintiff of failure to complete transfer transcripts. She also issued the directive in 2025 and the list of students from which Plaintiff and others were required to create Major Life Exemption ("MLE") forms related to fear of deportation without parental request or prior consent. Swinton followed up in writing demanding compliance after Plaintiff refused, and she participated in and presided over the meeting at which Plaintiff and other counselors were threatened with formal disciplinary letters if they did not comply. Ms. Swinton is sued in her individual and official capacities.

24. Defendant Kelly Whitney-Rivera, Ed.D., is and was at all times relevant to this Complaint the District's Director of Guidance and Chief Information Officer. As Director of Guidance, Dr. Whitney-Rivera exercises supervisory authority over all school counselors across the District, including Plaintiff, and is Dr. Small's functional supervisor for guidance department operations. Dr. Whitney-Rivera was directly involved in the Major Life Exemption process, participated in the meeting at which counselors were threatened with disciplinary action for

non-compliance, threatened Plaintiff specifically in response to her written objection to the directive, conducted and oversaw on behalf of the District the internal discrimination investigation prompted by Plaintiff's official complaint, initially filed an internal complaint on Plaintiff's behalf acknowledging discriminatory treatment in November 2025, and subsequently testified at the District's Board of Education meeting on July 9, 2026 that the Major Life Exemption process was enacted successfully, legally, and cooperatively with all counselors — a characterization that is directly contradicted by the documented record of directives she issued and threats she made. Dr. Whitney-Rivera is sued in her individual and official capacities.

25. Defendant Jennifer Buonaspina was the Assistant Principal for Pupil Services at Valley Stream North High School for the 2023-24 and 2024-25 school years, and was subsequently reassigned to oversee student discipline. She remains an Assistant Principal at the school. As Assistant Principal for Pupil Services, Ms. Buonaspina exercised supervisory authority over guidance and pupil services staff, including Plaintiff, and was responsible for overseeing student support programs and accommodations. Ms. Buonaspina engaged in conduct reflecting racial and religious animus, including immediately assigning Plaintiff to manage Islamic prayer accommodations for Muslim students which had previously been overseen by Swinton, a white, non-Muslim staff member. When Plaintiff expressed discomfort with the racial and religious tension and conflict she experienced from teachers who were inconvenienced by the accommodation, Buonaspina told Plaintiff that she was given a directive and must follow it. Buonaspina also initiated workplace conversations in which she referenced the October 7, 2023 Hamas attack in connection with concerns about Plaintiff's Facebook posts, characterized Hamas as a terrorist organization, and indicated that people at the school were "on edge" — directed to a Pakistani Muslim employee who had explicitly identified herself as Pakistani, not Arab or

Palestinian — and reprimanded her for being rude when she corrected a colleague who referred to her as Middle Eastern. Buonaspina further instigated and engaged in retaliatory conduct against Plaintiff including targeting her work for deeper scrutiny, making false claims to launch disciplinary action against her, and upon information and belief, encouraging guidance staff to exclude and isolate Plaintiff following her complaints regarding discrimination and the directive. Ms. Buonaspina is sued in her individual and official capacities.

26.     Defendant Lino Bracco was an Interim Principal of Valley Stream North High School for part of the 2025-26 school year. As Interim Principal, Mr. Bracco exercised supervisory authority over school counselors and other staff, participated in disciplinary proceedings, and served as an investigative officer for internal complaints. Mr. Bracco conducted the Stage I investigation of Plaintiff's November 3, 2025 discrimination complaint, signed the January 29, 2026 letter finding the complaint "unfounded," participated in disciplinary meetings with Plaintiff, and received multiple reports of retaliation against Plaintiff without taking remedial action. Mr. Bracco is sued in his individual and official capacities.

27.     Defendant Charles Loiseau is an Assistant Principal of Valley Stream North High School. As Assistant Principal, Mr. Loiseau exercises supervisory authority over school counselors and other staff and participates in disciplinary proceedings and student matters. Mr. Loiseau participated in disciplinary meetings with Plaintiff, investigated the January 6, 2026 complaint filed against Plaintiff, received Plaintiff's retaliation reports, and participated in the adverse employment actions described herein. He frequently told Plaintiff that "this would never fly" in New York City schools and that the way the District conducted investigations was "bizarre" and unacceptable.. Mr. Loiseau is sued in his individual and official capacities.

28.     Defendant Fabian Jara is an Assistant Principal of Valley Stream North High School. As Assistant Principal, Mr. Jara exercises supervisory authority over school staff, including Plaintiff. Mr. Jara was copied on Plaintiff's November 5, 2025 prayer accommodation inquiry, participated in the February 11, 2026 disciplinary meeting, and participated in the adverse employment actions described herein. Mr. Jara is sued in his individual and official capacities.

29.     Defendants John and Jane Does 1-10 are administrators, employees, Board members, and other persons associated with the District whose identities are presently unknown to Plaintiff, who participated in the discrimination, retaliation, and civil rights violations described herein. Plaintiff will seek to amend this Complaint to identify and name these Defendants upon the completion of discovery.

## FACTUAL ALLEGATIONS

### *The District And Valley Stream North High School*

30.     The Valley Stream Central High School District is one of only three central high school districts in New York State. It serves students in the Village of Valley Stream, South Valley Stream, North Valley Stream, and portions of Elmont, Franklin Square, and Malverne, all in Nassau County, New York.

31.     The District's student population is approximately 90 percent students of color, including approximately 30.1 percent Black, 31.2 percent Hispanic or Latino, and 22.9 percent Asian or Pacific Islander students. Approximately 30.5 percent of students are economically disadvantaged.

32.     Valley Stream North High School is a combined junior-senior high school educating students in grades 7 through 12, located at 750 Herman Avenue in Franklin Square, New York. It enrolls approximately 1,261 students.

33.     Valley Stream North serves a substantial population of ENL students, including students from South Asian, South American, Central American, and Caribbean immigrant families. These students include a significant cohort who speak Urdu, Punjabi, Hindi, Spanish, and Haitian Creole as their primary languages, many of whom are from Pakistan, Bangladesh, Guatemala, El Salvadore, and other immigrant communities. Many of these students are transported to Valley Stream North from neighboring communities, having been assigned to North specifically for specialized language services.

34.     The District's ENL student population was concentrated at Valley Stream North under the supervision of ENL Chair Defendant Swinton and served by a small group of counselors, including Plaintiff and her colleague Michelle Lopez, who between them carried a caseload of around 300 ENL students, approximately 150 each.

35.     Approximately 30 percent of the student population at Valley Stream North is South Asian, and the communities served include a substantial Muslim student population. Plaintiff was the only South Asian and Muslim counselor — and one of only four Middle Eastern, North African, or South Asian ("MENASA") employees, total — in the school.

***Plaintiff's Employment And Qualifications***

36.     Plaintiff was hired as a school counselor at Valley Stream North in approximately 2023, following a competitive five-round interview process involving panels of approximately ten people each, including Defendant Small, Defendant Whitney-Rivera, and other administrators. Plaintiff was offered the position in part because she speaks four languages —

English, Urdu, Punjabi, Hindi, in addition to some Bengali — making her the only counselor in the District capable of directly communicating with a large segment of its South Asian immigrant student population without an interpreter. She was explicitly told by an Assistant Principal at the time of her hiring that her multilingual abilities would benefit the District.

37. Plaintiff was assigned a mixed caseload of approximately 150 students, the majority of whom were ENL students from South Asian and South and Central American immigrant families. Her students included both recent arrivals navigating the American school system for the first time and longer-term ENL students working toward graduation.

38. Plaintiff was on a four-year probationary track under New York Education Law § 3012 and would have been eligible to receive tenure at the end of the 2026-2027 school year absent the District's termination decision.

39. Plaintiff is a practicing Muslim. Throughout her employment, she organized and administered voluntary Islamic prayer accommodations for Muslim students at Valley Stream North. This program served Muslim students observing daily prayers — including the *Zuhr* and *Asr* prayers that fall during the school day, particularly following daylight savings time changes — and was in operation continuously from prior to September 2023 through March 2026.

40. During her employment, Plaintiff received no formal disciplinary action and no prior disciplinary history. She was never subject to progressive discipline of any kind before the events described herein.

### *Racial Profiling: Muslim student prayer accommodation*

41. Under directive from Defendant Buonaspina, and with full knowledge and approval of school administrators including Defendants Jara and Small, Plaintiff took over coordination of the prayer accommodation that had previously been handled by Defendant

Swinton, a white, non-Muslim woman. Swinton had previously conducted the prayer break in the library, but Buonaspina insisted Plaintiff use a list of English teachers' classrooms which inevitably caused conflict with the teachers who did not want the students in their rooms. Plaintiff reported to Buonaspina that being the leader of the teachers' annoyance as a Muslim herself raised hostility and animus from teachers she needed to build relationships with to do her job effectively. Buonaspina simply told her to do what she was told. Ultimately, Plaintiff arranged designated prayer times, designated rooms, adult supervision, parental permission slips, and sign-in sheets. When Plaintiff requested to be taken off the project the following year, Defendants Buonaspina and Swinton assigned coordination to then-teaching assistant Tazir Ali, one of only three other MENASA employees at the school.

### *Racial Animus: The Buonaspina Hamas Comment*

42. In or about November 2023, days after Hamas' October 7, 2023 attack, a newly enrolled Pakistani middle school student drew a picture of an American flag with an X through it and a plane pointing toward a Pakistani flag. School administrators considered referring the student to social services on a theory that the drawing constituted a terroristic threat. Plaintiff intervened, speaking with the student in Urdu to understand the meaning behind the drawing in its cultural context. Translating for the student's mother in a meeting with administrators, Plaintiff explained that the student had been asked by a teacher to draw what she was feeling, and this was her expression of cultural identity and missing home. The referral to social services did not proceed, but Plaintiff's translation services put a target on her back.

43. Following this incident, Assistant Principal Jennifer Buonaspina engaged Plaintiff in a workplace conversation during which she stated that people were understandably "on edge" because of "everything that's going on," a reference to the Israel-Palestine conflict following the

October 7, 2023 Hamas attack. Defendant Buonaspina then told Plaintiff: "You know, Hamas is a terrorist organization."

44. Plaintiff responded: "I know, but you know I'm Pakistani, not Palestinian, so why are you telling me that?" Buonaspina explained that the guidance secretary had told her about Plaintiff's social media posts — from five years earlier, on an account that had long since been deactivated — expressing sympathy for murdered Palestinians and that not all Muslims are terrorists.

45. This comment by Defendant Buonaspina associated Plaintiff's Muslim identity with concerns about terrorist organizations, implicitly connecting her faith, her students' cultural expressions, and years-old protected political speech about Islam and Palestine into a framework of suspicion rooted in her religion and South Asian/Pakistani background.

46. But Defendants' racial and religious animus only escalated. Buospina wasn't the only one. And Plaintiff wasn't the only target. Guidance staff and teachers often complained about immigrant teenagers' smells, sometimes due to lack of awareness of American norms, cultural or religious hair treatments, or ethnic food smells. Faculty and staff frequently complained or gestured with hostility toward these ENL students, primarily Plaintiff's South Asian kids. Colleagues demanded that Plaintiff fix the problem. She worked to educate her students on American hygiene expectations, but it was never enough. She eventually began opening her office window and spraying air freshener to accommodate staff sensibilities. Later, they even criticized her for that, suggesting she was the one who complained about odors which, according to them, was the real reason she requested an office with a window.

47. Following Zohran Mamdani's election as Mayor of New York in November 2025, Defendant Jara emailed Plaintiff and other ENL counselors warning them to be extra supportive

of their Muslim and South Asian students because so many faculty and staff members were publicly making comments like, "Welcome to Mamdanistan," in reference to Mamdani's Muslim faith. Jara was later criticized for "putting it in writing."

***Exclusion from the Guidance Office***

48. When she arrived as the new counselor in North's guidance department, Plaintiff was given a small interior office with no windows, making meetings difficult in the cramped space.

49. After her doctor diagnosed her as high risk for Covid following back-to-back infections, he recommended she avoid cramped spaces and office in a well-ventilated space. When she submitted the request for an office with a window, Defendant Buonaspina seemed annoyed. She moved Plaintiff out of the guidance suite and into an office next to the principal's office because, she said, "I have to accommodate you now."

50. Though the separation from her colleagues was challenging, it was necessary for her health. So Plaintiff gratefully accepted the office for the 2023-24 school year.

51. She requested to move back into available spaces in the guidance suite each of the next two years. Buonaspina said only that she decides where everyone goes. Plaintiff remained in the principal's suite her second year. Her final year at the school, Defendant Whitney-Rivera granted Lopez's old office in the guidance suite to Plaintiff, since Lopez transferred. But before she could arrive to set up the space, Buonaspina placed a newly-hired social worker there. Plaintiff ended up working temporarily in the office of a counselor who was on maternity leave, but colleagues made comments frequently that the counselor did not like Plaintiff going in there.

52.     District staff later falsely asserted that Plaintiff had been the one to complain about her students' smell and requested the windowed office specifically for that reason, imputing their racial profiling to her and questioning her motivations.

***The National Origin Misidentification***

53.     Some time later in a department meeting, Defendant Swinton referred to Plaintiff and her ENL students as "Middle Eastern." Plaintiff patiently and appropriately corrected this misidentification, explaining that she is not Arab or Middle Eastern but South Asian, specifically Pakistani. Defendant Buonaspina later called Plaintiff into a meeting to tell her she received a complaint that Plaintiff had been rude and unprofessional for correcting the misidentification of her own national origin and ethnicity.

54.     The District's treatment of Plaintiff's correction of her own ethnic identity as an act of insubordination or unprofessionalism — rather than as the accurate self-identification of a Pakistani South Asian woman — reflects and confirms the discriminatory environment in which Plaintiff worked.

***The Transcript Scrutiny***

55.     Between late 2024 and early 2025, while Plaintiff was out sick for two days, Defendant Buonaspina directed Plaintiff's colleagues to review her international students' transcripts. No similar review was conducted of any other counselor's transcripts, including other ENL counselors. Defendants Buonaspina and Swinton then spent an entire day inspecting each record looking for errors. When Plaintiff returned to work, she was called into a two-hour after school meeting with Defendants Principal Small, Whitney-Rivera, and other administrators

regarding complaints that her students' transcripts were incomplete. In the meeting, Plaintiff was subjected to a review of around 30 individual student transcripts in her caseload.

56. Plaintiff had recently received approximately thirty new ENL students within a short period. ENL student transcripts require counselors to request official records from the students' home countries, which are then converted to New York State standard transcripts by NYSED — a process that can take weeks when records are located internationally or incompatible with New York's system. The scrutiny of Plaintiff's transcripts and the complaints to Small did not account for this timeline or the nature of ENL counseling work. Plaintiff brought student files documenting each step she had taken to obtain international records, demonstrating that she had been proactively and appropriately pursuing missing documentation. Defendants Whitney-Rivera and Dr. Small appeared to find the complaint about Plaintiff's transcripts difficult to justify.

57. Plaintiff learned from colleagues, including Defendant Whitney-Rivera, that Buonaspina had been inquiring about her work and had colleagues reviewing her work behind her back. Colleagues warned Plaintiff to "stay on Buonaspina's good side or she's out."

58. Following the transcript meeting and another conflict with Lopez, Defendant Buonaspina was removed from supervisory authority over the guidance department and reassigned to the discipline office beginning September 2025, confirming that the District itself had recognized the impropriety of Buonaspina's scrutiny.

59. Buonaspina sent Plaintiff an email later that week thanking Plaintiff for all the work she had done and expressing regret — short of apology —- that she put Plaintiff in an uncomfortable situation with Small and Whitney-Rivera. Upon information and belief, Small directed her to smooth things over with Plaintiff.

60.     But Defendants' retaliatory behavior did not stop. In fact, after her reassignment and Plaintiff's testimony in Lopez's complaint against her, Buonaspina seemed more determined than ever to punish Plaintiff.

***ENL Curriculum and the 9/11 Controversy***

61.     Valley Stream North serves a substantial population of English Language Learner students who, after passing their core ENL proficiency examinations, continue in a mandatory ENL support class that meets every other day. The support class is designed to build the advanced academic language skills students will need in college and beyond — essay drafting, editing, argumentation, formal writing. For many of these students, the class represents their primary structured pathway from functional English fluency to the kind of academic fluency that opens competitive post-secondary opportunities. The students in these classes are predominantly South Asian, Muslim, and from Middle Eastern, North African, and South Asian backgrounds. Many travel up to an hour each way by bus to access the specialized ENL services available at Valley Stream North.

62.     Beginning in late 2023, students began telling Plaintiff that something was wrong with the support class. The teacher, they said, was talking about September 11 every day. Not in the weeks around the anniversary. Every day. Plaintiff relayed the concern to administrators and assumed it reflected the kind of topic that sometimes extends past its natural endpoint before a teacher course-corrects. Administration told her they had looked into it and it was being handled. She believed them.

63.     It was not handled. By February 2025, Plaintiff learned the full scope of what had been happening. For two consecutive school years, the ENL support class teacher had made the September 11 attacks the organizing theme of the class — not a unit, not a module, but the

persistent, daily subject of instruction for students who had enrolled in a class designed to teach them how to write a college essay. The curriculum featured a sustained presentation of images of Taliban fighters wearing head wraps alongside repeated characterizations of Muslims as terrorists. For Muslim students, South Asian students, and Sikh students sitting in that classroom day after day, the message was not subtle.

64. The consequences were concrete and documented. Students from other demographic groups began calling Sikh classmates terrorists because they wore head wraps like the men they had been shown in class. Muslim and South Asian students — some of whom had ridden a bus for an hour to be at Valley Stream North specifically for these ENL supports — began cutting class out of anxiety, frustration, and in some cases protest. They received detention for the absences. They complained to their parents. They went to Board of Education meetings and said publicly that they felt targeted and stigmatized in a class that was supposed to be helping them. The inter-group conflict the curriculum generated rippled through the school community.

65. In or around February 2025, a Muslim student reached a breaking point. During class, he confronted the teacher directly, telling her that two years of daily terrorism content was enough and that he and his classmates understood — they did not need to keep revisiting it. The teacher responded that her uncle had been killed on September 11, and that for that reason they were going to keep covering it, and everyone should know what happened. The student was disciplined for the confrontation.

66. Plaintiff intervened on behalf of this student and others. She advocated within the school for a fair resolution and helped get the immediate disciplinary matter addressed. But the episode did not resolve without cost to her. Administrators who received these complaints —

complaints Plaintiff was channeling on behalf of Muslim and South Asian students who had no other professional in that building who could speak their languages and navigate their concerns — responded to her advocacy not as legitimate student welfare work but as an escalating source of tension. Her willingness to stand up for students who felt they were being associated with terrorism in their own classroom made her, in the eyes of certain administrators, the problem. It was one more entry in an accumulating ledger of reasons to regard Samia Tariq-Farooq with suspicion.

### *The Major Life Exemption Directive*

67. In 2025, the New York State Education Department promulgated regulations and guidance authorizing school superintendents to grant exemptions from Regents diploma assessment requirements for students who have experienced a qualifying "major life event." Under NYSED's own guidance, qualifying events include cancer treatment, hospitalization, serious injury, a house fire, the death of a parent or person in parental relation, homelessness, and trauma related to fear of deportation or detainment. Critically, under NYSED guidance, requests for exemptions may be initiated by the student, their parent or person in parental relation, or their counselor, teacher, or administrator — but before the superintendent may grant an exemption, prior written consent must be obtained from the student's parent or person in parental relation. And the exemption must be fully approved and granted before administration of the Regents exam. The exemption process is also subject to NYSED's guidance and the New York State Office of the Attorney General's directive prohibiting schools from requesting or providing information about student immigration status or from disclosing personally identifiable student information without consent.

68. In 2025, Defendant Swinton emailed a list of all ENL students to Plaintiff, her fellow ENL Counselor Michelle Lopez, and Restorative Counselor Joanne Phillip who had a small number of Haitian Creole-speaking ENL students on her caseload. The directive accompanying the list instructed the counselors to create a Regents exemption form for each ENL student on the list — based solely on the students' identity as ENL learners — without any individualized assessment of whether a qualifying major life event had occurred, without any contact with the students or their families, and without any parental notification or consent.

69. The District then waited for the June Regents examination results. For any ENL student who did not pass the Regents examination at the level they were pursuing — whether the basic Regents diploma or the advanced Regents diploma — the District then presented parents with the pre-prepared exemption forms, obtained parental signatures, and submitted those exemption forms on the students' behalf as though they had been properly granted and finalized before the exam. Parents were not informed of alternative options such as summer school programs or the option to simply retake the examination. The District did not obtain informed consent before generating the forms. The forms were generated automatically, and consent was solicited only after the fact, in a context where parents were not told what they were consenting to or what alternatives existed. So nearly every ENL student at North who failed the Regents exam that year were reported by the District as having had a traumatic fear of deportation, whether they did or not.

70. The District's implementation resulted in ENL students, the overwhelming majority of whom were South Asian, South American, Central American, and Haitian immigrant students, receiving permanent "E" designations on their official transcripts with fear of deportation as the basis for their exemption from required Regents examinations, information the

District shares with colleges upon request. Many of these students were United States citizens, lawful permanent residents, or individuals with valid visas who had no actual fear of deportation for themselves or their families. Because the exemptions were applied categorically to ENL students who failed the Regents rather than individually to students who experienced a qualifying major life event and requested an exemption, many students received this designation without understanding what it meant, what it reflected, or what the long-term consequences were.

71. Students who received "E" designations on their transcripts, including students who had received the exemption only on the advanced portion of the Regents examination, later contacted Plaintiff to ask what the "E" stood for, because colleges reviewing their transcripts for competitive programs were questioning it. Students pursuing competitive academic programs were disadvantaged in college admissions as a result of a formal designation suggesting they were not capable of passing the exam they could have simply retaken. These long-term implications and alternative means of earning the credit without the designation were never fully explained to them or their families.

72. Plaintiff immediately perceived the directive as discriminatory, unlawful, and ethically incompatible with her professional obligations. The directive required her to profile ENL students — a population defined by national origin, immigration background, and primary language — as presumptively fearing deportation, and to take action on their academic records based on that assumption without their knowledge or consent. The directive required her to assume that ENL students had fear of deportation simply because they were ENL students, a categorization that treated immigrant-background students as a monolithic, vulnerable class defined by their perceived immigration status rather than as individuals with varying

circumstances, documentation, and needs. Plaintiff's perception was correct: the directive violated the NYSED's own consent and timing requirements, the New York State Attorney General's guidance prohibiting schools from soliciting or disclosing student immigration status information, and the Family Educational Rights and Privacy Act's prohibition on the use of personally identifiable student information without parental consent.

73. Plaintiff refused to comply with the directive. She was not alone. Her colleague Michelle Lopez, a tenured counselor with approximately twenty years of experience, also refused, stating that the directive was offensive and that she agreed with Plaintiff's objection. Restorative counselor Joann Phillip also refused.

74. Because Plaintiff and the other counselors were uncomfortable complying and did so only under continued pressure, they added the notation "at direction of ENL chair" to the forms they filled out, documenting that they were acting under administrative compulsion rather than of their own professional judgment. They were reprimanded for this notation. When directed to send completed forms to students who failed the June Regents, Plaintiff and Lopez directed any questions from parents and students to the Defendants Whitney-Rivera and Swinton rather than personally fielding inquiries about a process they believed was unlawful. They were reprimanded for this as well.

75. Plaintiff communicated her objections in an email to Defendants Swinton, Whitney-Rivera, and other District administrators.

### The Meeting: Threats And Retaliation

76. Defendant Swinton, Defendant Whitney-Rivera, and other administrators convened a meeting in the District conference room attended by Plaintiff, Lopez, and Phillip, The meeting lasted approximately one hour and was also attended by the District's legal counsel.

77. At the meeting, Defendant Whitney-Rivera told Plaintiff: "Samia, you have some nerve sending me an email like that. You don't follow directives. If you were asked to do something, you should have just done it."

78. When Plaintiff and her colleagues continued to object, Defendant Whitney-Rivera stated directly to Plaintiff: "You're not even tenured and you have the audacity to send an email like this." This statement connected Plaintiff's protected activity — her written objection to an unlawful and discriminatory directive — to the explicit threat of employment consequences, made by a supervisor with direct authority over Plaintiff's tenure track.

79. Plaintiff was subsequently terminated one year before tenure qualification.

80. Plaintiff's colleague Lopez interjected, saying she did have tenure, and she agreed that it was offensive to be asked to do such a thing. Lopez's defense of Plaintiff resulted in Lopez herself experiencing hostility from administrators, culminating in Lopez requesting and receiving a transfer to another school at the beginning of the 2025-26 school year.

81. All three counselors who refused were threatened with formal letters being placed in their files if they did not comply. Plaintiff, Lopez, and Phillip ultimately filled out the forms as directed, with the "at direction of ENL chair" notation, but refused to personally participate in having the exemptions approved through a process they believed was unlawful. Plaintiff directed families who contacted her with questions about the forms to the Whitney-Rivera and Swinton.

82. The following school year, the District told counselors that implementation of the exemptions would not be granted in the same manner as the prior year because Valley Stream had been flagged statewide as having the highest exemption rate among New York school districts under the Major Life Exemption program — confirming that administrators were aware

the program had drawn scrutiny and that the District's implementation had been recognized as anomalous and problematic.

83.     On July 9, 2026, at the District's Board of Education annual reorganization meeting, Defendant Whitney-Rivera presented to the Board of Education regarding the Major Life Event Exemption program, describing how the District enacted the plan. According to contemporaneous press reporting in the Long Island Herald, she characterized the District's MLE implementation as lawful, in line with the intention of the program, coordinated with full cooperation from guidance staff, and generally successful. She did not mention the list, the preemptive form creation for all ENL students, or the retroactive grants of exemptions.

### *The Retaliation Against Lopez And Plaintiff's Testimony*

84.     Prior to the final escalation of hostility directed at Plaintiff, a substantially identical pattern of retaliation was directed at her colleague Michelle Lopez. Lopez was a tenured school counselor at Valley Stream North with approximately twenty years of experience who had been the primary ENL counselor before Plaintiff's hire in 2023. Lopez had also refused to comply with the MLE directive, stating openly at the meeting convened by Defendants Swinton and Whitney-Rivera that the directive was offensive and that she agreed with Plaintiff's objection.

85.     Following Lopez's refusal, Defendant Buonaspina began targeting her. Buonaspina directed hostility toward Lopez through the guidance department secretary — an employee who functioned as a conduit for Buonaspina's animosity toward any staff member who fell out of her favor — and orchestrated the guidance department's collective isolation of Lopez in the same manner she would subsequently direct against Plaintiff. The guidance department as a whole ganged up against Lopez, excluding her from collegial interactions and creating a hostile

professional environment in direct response to her refusal to participate in the profiling of immigrant students.

86. In 2025, Lopez filed a formal complaint documenting the toxic and hostile work environment Defendant Buonaspina had created and encouraged, naming Buonaspina and the guidance department secretary as responsible for the hostility directed at her. The complaint arose directly from and in temporal proximity to Lopez's refusal to comply with the MLE directive.

87. In or around May 2025, near the end of the school year, Plaintiff provided testimony on Lopez's behalf in connection with Lopez's complaint. Plaintiff corroborated Lopez's account of the hostile environment Buonaspina had created and the retaliatory isolation that followed Lopez's protected refusal. This testimony constituted protected speech on a matter of public concern — Plaintiff was not advocating about a purely personal employment dispute but corroborating a documented pattern of retaliation against a colleague who had engaged in the same protected activity as Plaintiff herself.

88. Lopez ultimately requested a transfer out of Valley Stream North. The transfer was granted. She left the school at the end of the 2024-2025 school year. Her departure removed the only other senior ENL counselor who had witnessed and refused the directive, leaving Plaintiff as the sole remaining counselor who had opposed it and remained in the building.

89. The acceleration of adverse actions against Plaintiff in the fall of 2025 — beginning with the escalating hostility documented in her November 3, 2025 internal complaint — followed directly from the end of the school year in which Plaintiff had testified on Lopez's behalf and Lopez had departed. The pattern that had been applied to Lopez was now applied to Plaintiff in full, by the same actors, through the same mechanisms, for the same reasons.

*Plaintiff's Discrimination Complaint*

90. In late 2025, during a conversation with Defendant Whitney-Rivera, her supervisor, Plaintiff asked why she was being constantly singled out and scrutinized. Whitney-Rivera told Plaintiff that she had a reputation, created by Buonaspina's frequent comments to colleagues, for doing things wrong. Whitney-Rivera warned Plaintiff that Buonaspina was after her because she did not fit in at the school, and that she needed to be careful to stay on her good side. Several colleagues also warned Plaintiff that Buonaspina constantly asked her colleagues in the guidance office to watch Plaintiff and report to her everything she did. Whitney-Rivera told Plaintiff that Buonaspina often pressured her to issue write ups to Plaintiff but that she did not see a reason to do so.

91. Plaintiff shared her belief that Buonaspina's reasons for targeting her were based on her race, religion, and national origin. Over Plaintiff's objections, Whitney-Rivera immediately opened her laptop and sent an email to the District Assistant Superintendent for Personnel reporting that Plaintiff felt racially targeted, triggering a discrimination investigation.

92. Whitney-Rivera later told Plaintiff she could not do anything else to help her because filing the discrimination complaint put a target on her back.

93. After Defendant Bracco conducted the discrimination investigation, he told Plaintiff that no discrimination was found. Upon information and belief, the District altered Bracco's report to remove some of his findings in an effort to obscure evidence of discriminatory actions. Bracco advised her to find another job and leave the District.

*The Escalating Retaliation*

94.     Following Plaintiff's refusal to comply with the MLE directive and her November 3, 2025 internal discrimination complaint, Defendants subjected Plaintiff to a sustained pattern of escalating adverse employment actions.

95.     The entire guidance department ceased speaking with Plaintiff. This ostracization was not spontaneous. Plaintiff overheard colleagues gathered in another counselor's office discussing an email exchange in which they stated they had administrative backing not to communicate with her and that they intended to isolate her because they no longer wanted her in the department. One Middle School ENL Counselor told Plaintiff directly that she had initially wanted to support her but felt pressure from others to stop communicating with her.

96.     A teaching assistant at the school told Plaintiff that Buonaspina had asked her to keep a close eye on Plaintiff and to document everything by email, which would then be forwarded to Buonaspina. This constituted surveillance of Plaintiff by a supervisor motivated by discriminatory animus and retaliation.

97.     On or around January 6, 2026, a coordinated complaint was filed against Plaintiff by members of the guidance department alleging that she had made false allegations against colleagues in bad faith and that her 8-year-old social media posts had made staff feel personally targeted.

98.     The coordinated hostility directly mirrored Lopez's experience and hostile work environment complaint she had filed — and on whose behalf Plaintiff had testified — at the end of the previous school year a few months earlier.

99.     Prior to her employment with the District, Plaintiff had maintained personal social media accounts, including a Facebook account, on which she had published posts. These posts from 2018 included a repost of President Obama's statement that not all Muslims are terrorists, and a shared news report about Palestinian civilian casualties at the hands of Israeli forces in connection with the opening of the United States embassy in Jerusalem.

100.    The District was aware of these posts at the time it hired Plaintiff in 2023.

101.    Plaintiff's posts concerned matters of profound public concern: United States foreign policy, the treatment of Palestinian civilians, and the relationship between Islam and American political identity. They were made on personal social media platforms, as a private citizen, outside of working hours, years before she was employed by the District, and entirely unrelated to her duties as a school counselor.

102.    No concern about Plaintiff's social media posts was raised by the District at any time prior to her November 3, 2025 internal discrimination complaint. After that complaint was filed, members of the guidance department — upon information and belief, at the direction of or with the encouragement of administrators including Buonaspina — filed a coordinated complaint against Plaintiff on January 6, 2026 that cited her social media posts as having made staff "feel personally targeted."

103.    To respond to this complaint, Plaintiff had to reactivate her Facebook account, which she had not used in several years. When she did, only two posts were visible: the Obama repost and the post about the 28 Palestinian civilians killed by Israeli forces from 2018. Both posts had been published years before the events at issue. Both were known to the District when

Plaintiff was hired. Both reflected Plaintiff's constitutionally protected political speech on matters of public concern, intrinsically tied to her Muslim identity and faith.

104. The District used these posts eight years after they were published, despite having known about them at hiring, resurfaced only after Plaintiff's protected discrimination complaint, as grounds for adverse employment action.

### *March 13, 2026: Removal, Administrative Leave, and Termination*

105. On or around January 29, 2026, Defendant Bracco concluded the Stage I investigation of Plaintiff's November 3, 2025 discrimination complaint, finding the allegations "unfounded." The investigation failed to interview ENL students who were directly affected by the MLE directive and whose testimony would have corroborated Plaintiff's account, failed to adequately address retaliatory conduct that had occurred during the investigative process, and was conducted and concluded while retaliatory acts were ongoing. The District also refused to consider any allegations of discrimination that occurred prior to the current school year, eliminating from consideration the two-year pattern of abuse and retaliation conducted by Defendant Buonaspina.

106. Less than two weeks later, on or around February 10, 2026, Defendant Small issued a Notice of Meeting directing Plaintiff to appear on February 11, 2026, with an explicit warning that she might be "the subject of disciplinary action," issued while her discrimination appeal was still pending.

107. On February 12, 2026, Plaintiff filed a Formal Rebuttal in her discrimination complaint documenting three categories of retaliation the District had failed to address: (1) open public discussion of her discrimination complaint in intimidating ways by colleagues; (2) statements by staff members that they would "unite" to make her tenure impossible; and (3)

information she had received that members of the guidance team had felt pressured to sign a collective complaint against her with the representation that there was administrative backing for doing so.

108. The same day, the District concluded its investigation of the January 6, 2026 complaint filed against Plaintiff, finding no evidence to substantiate the complaint. Notwithstanding this finding clearing Plaintiff of the allegations made against her, the District proceeded with adverse employment actions.

109. On March 9, 2026, Plaintiff formally reported retaliation to Defendant Loper and her union representative, attaching five exhibits documenting post-complaint exclusion from standard counselor communications, the hostile atmosphere in the guidance department, and specific incidents of retaliatory conduct.

110. On or around March 11, 2026, two days after Plaintiff's retaliation complaint and three weeks after complaints against Plaintiff were declared unfounded, Defendant Loper issued a termination recommendation letter, recommending to the Board of Education that Plaintiff's appointment as a school counselor be terminated effective June 26, 2026, and that she be placed on administrative leave immediately. The termination recommendation was issued without any prior progressive discipline, without any formal disciplinary history, and in direct temporal proximity to Plaintiff's documented reports of retaliation and discrimination.

111. On or around March 12, 2026, the Stage II informal hearing regarding Plaintiff's discrimination appeal was held as scheduled with Defendant Loper. Rather than issuing a decision on the appeal, Defendant Loper issued an administrative removal order the following day.

112. On or around March 13, 2026, Defendant Loper issued a letter, hand-delivered by Defendant Small, placing Plaintiff on administrative reassignment to home with pay, effective immediately, pursuant to Education Law § 1711. The letter prohibited Plaintiff from communicating with students, staff, or families, and barred her from District property. Plaintiff surrendered her identification badge and laptop computer and was physically escorted from the school building.

113. On or around March 13, 2026, the same day Plaintiff was removed from the building, the Islamic prayer accommodations she had been assigned to organize and administer for Muslim students since December 2023 were cancelled. This cancellation occurred during the last week of Ramadan, when the need for Islamic prayer accommodation during the school day is most acute for observant Muslim students. Upon information and belief, prayer accommodations were never reinstated.

114. On March 13, 2026, the same day Plaintiff was removed from the building, her replacement — a white, non-Muslim teaching assistant with far fewer qualifications and less experience than Plaintiff — began working in Plaintiff's position at the school. The simultaneous removal of Plaintiff and installation of her replacement on the same day demonstrates that the decision to terminate Plaintiff had been made and implemented in advance of any legitimate evaluative process.

115. On March 23, 2026, Plaintiff received a letter stating the reasons for the termination recommendation. The letter cited alleged insubordination and performance deficiencies dating to 2023 and 2024 which had never been brought to her attention before. These grounds directly contradicted the District's own representation to Plaintiff during the February 10-11, 2026 disciplinary proceedings that the scope of the investigation was limited to

the current school year. The cited incidents included a college application matter involving a student's transcript, a question about ENL grading in November 2023, scheduling questions from September 2023, and an ENL placement question from August 2025. None of these incidents had previously resulted in any disciplinary action. None had been raised with Plaintiff as performance concerns during her three years of employment. Indeed, grading, scheduling, and placement were not even in Plaintiff's control as a counselor. Their use as termination grounds two or three years later was pretextual.

116. The Board of Education voted on Defendant Loper's termination recommendation at its April 14, 2026 meeting, ratifying the recommendation.

117. On May 14, 2026, Plaintiff filed a civil rights complaint with the New York State Attorney General's Office (Complaint #1-1264363592).

118. Plaintiff's employment with the District ended effective June 26, 2026. She has been applying for equivalent jobs since March 2026 but has yet to find anything.

### Monell Allegations

119. The constitutional violations described herein were carried out pursuant to the official policy and custom of the District. Defendant Loper, as Superintendent, is the District's final policymaker for employment decisions. His termination recommendation, his administrative reassignment order, his refusal to complete assessment of Plaintiff's discrimination and retaliation complaints, and his conduct throughout the period described herein constitute official policy for purposes of *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

120. The Board of Education's April 14, 2026 vote ratifying the termination recommendation constitutes institutional adoption of the challenged conduct as official District policy.

121. The District's failure at every level of its internal complaint process — Stage I and Stage II investigations that found discrimination "unfounded" while retaliatory acts continued; the refusal to address documented retaliation during the investigative process; the issuance of a termination recommendation two days after a retaliation report — establishes a custom of deliberate indifference to constitutional violations that is itself a basis for municipal liability. And the District's retaliatory pattern was not confined to Plaintiff. The same sequence of isolation, hostile work environment, and forced departure was directed at Michelle Lopez following her refusal to comply with the same MLE directive — confirming that the conduct against Plaintiff was not aberrational but reflected a custom and practice of retaliating against employees who opposed the District's unlawful program.

122. The harm caused by Defendants' unconstitutional conduct is not limited to the termination itself but extends to the continuing professional consequences imposed on Plaintiff through the District's administrative record, its control over her employment references, and the reputational damage created by the public manner of her removal — consequences that persist and compound with each passing month in which Plaintiff remains unable to obtain comparable re-employment.

## CLAIMS

### COUNT ONE
### 42 U.S.C. § 1983 — First Amendment Retaliation
### (Citizen Speech — Social Media Posts)

*Against All Individual Defendants in Their Individual Capacities;*
*Against the District, Official Capacity Defendants Under Monell*

123. Plaintiff repeats and re-alleges paragraphs 1 through 122 as if fully set forth herein.

124. The First Amendment, made applicable to state actors through the Fourteenth Amendment, prohibits a government employer from retaliating against an employee for speech made as a private citizen on a matter of public concern. *See Pickering v. Board of Education*, 391 U.S. 563 (1968). Where an employee speaks as a private citizen — not pursuant to official duties — on a matter of genuine public concern, the government bears the burden of demonstrating that its interest in operational efficiency outweighs the employee's expressive interest. Id. The Second Circuit has consistently held that geopolitical commentary, foreign policy criticism, and speech about racial and ethnic minority communities constitute matters of public concern entitled to robust First Amendment protection. *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011); *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008).

125. Plaintiff's Facebook posts — a 2018 repost of President Barack Obama's statement that not all Muslims are terrorists, and commentary about Palestinian civilian casualties during the opening of the United States embassy in Jerusalem — were made as a private citizen, on personal social media platforms, entirely outside her employment duties, about matters of foreign policy, armed conflict, religious identity, and the United States government's role in the Middle East. These are paradigmatic matters of public concern. The

posts bore no relationship to Plaintiff's professional responsibilities as a school counselor. They were not made pursuant to any official duty. *Garcetti v. Ceballos*, 547 U.S. 410 (2006), has no application here: the posts were made years before Plaintiff's employment with Valley Stream, on personal accounts, about global political events entirely unrelated to her work.

126. Under Pickering balancing, the District's interest in suppressing this speech — or retaliating against it — cannot survive scrutiny. The posts were published years before any adverse action, were known to the District at the time of Plaintiff's hiring in 2023, generated no community complaint at any time during Plaintiff's employment, and were weaponized as grounds for discipline, scrutiny, and retaliation only after Plaintiff filed an internal discrimination complaint in November 2025. An employer cannot retrospectively invoke pre-employment speech it knowingly accepted at hiring as grounds for post-complaint termination without demonstrating that the speech caused actual disruption to operations, a showing Defendants cannot make. *See Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (government must show actual disruption, not speculative harm).

127. The causal chain between Plaintiff's protected speech and the adverse actions is direct and documented. The January 6, 2026 complaint filed against Plaintiff by the guidance department explicitly cited her social media posts. The same posts had been shared with an administrator by a colleague acting at administrative direction. An Assistant Principal referenced Plaintiff's Palestine-related posts in a workplace interrogation in which she then stated that Hamas is a terrorist organization — a comment directed at Plaintiff solely because of her Muslim identity and her speech about a Muslim-majority community's political struggle. The posts were then incorporated into the pretextual record used to justify termination. This sequence — protected speech known at hiring, untouched for years, mobilized immediately after protected

activity as a disciplinary weapon — is precisely the kind of retaliatory pretext the First Amendment's anti-retaliation doctrine exists to prohibit. *See Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004).

128. Individual Defendants directed, participated in, and ratified each step of this retaliation. Defendant Buonaspina referenced the posts in a discriminatory workplace interrogation. Defendant Bracco received and investigated the complaint that cited the posts without finding a violation — and the District proceeded with adverse action anyway. Defendant Loper incorporated conduct related to the posts into the termination recommendation. Defendants Swinton and Whitney-Rivera participated in the hostile environment that surrounded the complaint and the posts' use as a disciplinary instrument.

129. At the time of the retaliatory conduct, it was clearly established under Pickering, Garcetti, and their Second Circuit progeny that a government employer may not retaliate against an employee for protected citizen speech on matters of public concern. No reasonable official could have believed that citing an employee's pre-employment, publicly known, faith-based political commentary as grounds for post-complaint termination was constitutionally permissible. Individual Defendants are not entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

130. The District is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because Defendant Loper, as the District's final policymaker for employment decisions, directed and ratified the retaliatory conduct, and because the Board of Education's April 14, 2026 vote ratifying the termination constitutes institutional adoption of the challenged policy.

131. Individual Defendants' conduct was intentional, malicious, or in reckless disregard of Plaintiff's federally protected rights, entitling her to punitive damages. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

132. The adverse employment actions attributable to Defendants' retaliation for Plaintiff's protected social media speech are specific and documented. Defendant Buonaspina's prolonged campaign of scrutiny that created the hostile work environment Plaintiff suffered through began just weeks into Plaintiff's employment with the District, by her own admission, as a result of Buonaspina learning about the social media posts. On January 6, 2026 — less than ten weeks after Plaintiff filed her internal discrimination complaint — the guidance department filed a formal complaint against her that explicitly cited her Palestine-related social media posts as having made staff feel "personally targeted." That complaint triggered a formal disciplinary investigation that placed Plaintiff under institutional scrutiny, added adverse material to her employment record, and required her to reactivate a deactivated social media account to respond to charges about her own pre-employment speech. The investigation was itself an adverse employment action: it subjected Plaintiff to a formal process, consumed her professional standing, contributed to the hostile work environment in which her colleagues refused to speak with her, and produced a record of disciplinary proceedings that the District later incorporated, alongside other pretextual grounds, into the March 23, 2026 termination letter. The retaliatory use of Plaintiff's protected speech did not operate in isolation; it was one instrument in a coordinated campaign of escalating adverse actions that began with the social media complaint, continued through the formal investigation, and culminated in her termination. Each step in that sequence was a foreseeable and intended consequence of the initial retaliatory act. A plaintiff need not show that protected speech was the sole cause of an adverse employment action, only

that it was a substantial or motivating factor. *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977); *Cotarelo v. Village of Sleepy Hollow Police Department,* 460 F.3d 247, 251 (2d Cir. 2006). The documented sequence here — protected speech, formal complaint citing that speech, investigation, hostile work environment, termination — satisfies every element of a First Amendment retaliation claim and establishes both causation and harm with specificity that leaves no analytical gap.

133. As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered lost employment, lost wages and benefits, the loss of her tenure track and the professional security it represents, damage to her professional reputation in a specialized field, severe emotional distress including anxiety and depression for which she has sought medical treatment, and other economic and non-economic damages in amounts to be determined at trial.

**COUNT TWO**
**42 U.S.C. § 1983 — First Amendment Retaliation**
**(Opposition to MLE Directive)**

*Against All Individual Defendants in Their Individual Capacities;*
*Against the District, Official Capacity Defendants Under Monell*

134. Plaintiff repeats and re-alleges paragraphs 1 through 122 as if fully set forth herein.

135. Plaintiff's written opposition to the MLE directive — communicated to Defendants Swinton, Whitney-Rivera, Small, and others in documented written correspondence — constituted protected citizen speech on a matter of public concern. The Second Circuit has held that speech opposing unconstitutional government conduct targeting third parties, even when made in a workplace context, may constitute protected citizen speech where it goes beyond the employee's ordinary job responsibilities and addresses matters of broader public significance.

*Lane v. Franks*, 573 U.S. 228, 240 (2014); *contra*. *Weintraub v. Board of Education*, 593 F.3d 196, 203 (2d Cir. 2010).

136. Plaintiff's opposition was not a routine workplace grievance about the terms of her own employment. It was a refusal to participate in what she reasonably believed was an unconstitutional and unlawful government program — the profiling of immigrant and Muslim students by perceived immigration status without consent, in violation of the New York State Education Department's own guidance, the New York State Attorney General's directives, and the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g. Creating MLE exemption forms categorically for all students who speak a language other than English at home, to be processed without fully informed parental consent if those students failed standardized examinations, implicated the constitutional rights of the students and families who were its subjects. Opposing the government's use of a school counselor as an instrument of that program is not within the ordinary scope of school counseling duties under any reasonable reading of that role. It is citizenship.

137. The public concern element is easily satisfied. The profiling of immigrant and Muslim students by perceived immigration status, the imposition of permanent transcript designations reflecting fear of deportation on students who did not request or consent to them, and the potential downstream consequences of compiling and transmitting identifying information about students from immigrant communities during a period of aggressive federal immigration enforcement are matters of significant public concern that go well beyond the internal operations of Valley Stream North High School. *Connick v. Myers*, 461 U.S. 138, 146 (1983).

138. Defendants retaliated against Plaintiff for this speech with escalating adverse employment actions beginning immediately after her written objection: threats at the December 2025 meeting, the January 6, 2026 coordinated complaint, the manufactured disciplinary proceedings, and ultimately the March 11, 2026 termination recommendation issued two days after her most recent documented retaliation report. The temporal proximity between each protected act and each retaliatory response is itself powerful evidence of causation. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (temporal proximity of six months sufficient to raise inference of retaliation).

139. Plaintiff's protected speech in opposition to the MLE directive extended beyond her own written objection. In or around May 2025, Plaintiff provided testimony on behalf of her colleague Michelle Lopez in connection with Lopez's formal complaint against Defendant Buonaspina — a complaint documenting the retaliatory hostile work environment Buonaspina had created in direct response to Lopez's refusal to comply with the same unlawful directive. This testimony constituted protected citizen speech on a matter of public concern: Plaintiff was not advocating about her own working conditions but corroborating a documented institutional pattern of retaliation against counselors who refused to profile immigrant students in violation of their legal and ethical obligations. *See Lane v. Franks*, 573 U.S. 228, 240 (2014). The acceleration of retaliatory conduct against Plaintiff in the fall of 2025 — including the coordination of the guidance department's collective isolation of Plaintiff that directly mirrored what Lopez had experienced — followed immediately upon Lopez's departure and Plaintiff's testimony on her behalf, establishing both the causal connection and the institutional nature of the retaliatory pattern.

140.     The District is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because Defendant Loper, as the District's final policymaker for employment decisions, directed and ratified the retaliatory conduct, and because the Board of Education's April 14, 2026 vote ratifying the termination constitutes institutional adoption of the challenged policy.

141.     Individual Defendants' conduct was intentional, malicious, or in reckless disregard of Plaintiff's federally protected rights, entitling her to punitive damages. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

142.     As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered lost employment, lost wages and benefits, the loss of her tenure track and the professional security it represents, damage to her professional reputation in a specialized field, severe emotional distress including anxiety and depression for which she has sought medical treatment, and other economic and non-economic damages in amounts to be determined at trial.

**COUNT THREE**
**42 U.S.C. § 1983 — First Amendment Compelled Speech**

*Against All Individual Defendants in Their Individual Capacities;*
*Against the District, Official Capacity Defendants Under Monell*

143.     Plaintiff repeats and re-alleges paragraphs 1 through 122 as if fully set forth herein.

144.     The First Amendment prohibits the government from compelling individuals to be the instrument of a message or expressive act they find objectionable on grounds of conscience, belief, or identity. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Janus v. AFSCME*, 585 U.S. 878, 892 (2018); *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023). The compelled speech doctrine operates independently of the employee speech doctrine established in Garcetti: the

relevant question is not whether the compelled act falls within job duties, but whether the government may compel it at all. *See Wooley*, 430 U.S. at 714.

145. Defendants directed Plaintiff to create official government documents — Major Life Event Exemption forms — on behalf of students who had not requested them, based on those students' language background and presumed immigration status, for submission to the New York State Education Department without informed parental consent. This directive required Plaintiff to affix her professional identity, her judgment, and her signature to an expressive act whose premise — that ENL students are presumptively at risk of deportation and should be administratively exempted from academic requirements on that basis without their knowledge — she found factually false, legally impermissible, and morally indefensible. It required her to speak, in her professional capacity, a message she did not believe and that she reasonably concluded was harmful to the very students the message purported to help.

146. Plaintiff's refusal was an act of protected expressive non-participation. Defendants retaliated against her for that refusal with the adverse employment actions described throughout this Complaint. The fact that the directive was framed as an employment instruction does not insulate it from First Amendment scrutiny: a government employer cannot compel a professional to be the instrument of a discriminatory and legally impermissible government program by characterizing noncompliance as insubordination. See *Wooley*, 430 U.S. at 715.

147. The District is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because Defendant Loper, as the District's final policymaker for employment decisions, directed and ratified the retaliatory conduct, and because the Board of Education's April 14, 2026 vote ratifying the termination constitutes institutional adoption of the challenged policy.

148.     Individual Defendants' conduct was intentional, malicious, or in reckless disregard of Plaintiff's federally protected rights, entitling her to punitive damages. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

149.     As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered lost employment, lost wages and benefits, the loss of her tenure track and the professional security it represents, damage to her professional reputation in a specialized field, severe emotional distress including anxiety and depression for which she has sought medical treatment, and other economic and non-economic damages in amounts to be determined at trial.

**COUNT FOUR**
**42 U.S.C. § 1983 — Equal Protection**
**Religion and National Origin / Ancestry**

*Against All Individual Defendants in Their Individual Capacities;*
*Against the District, Official Capacity Defendants Under Monell*

150.     Plaintiff repeats and re-alleges paragraphs 1 through 122 as if fully set forth herein.

151.     The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from intentionally discriminating against individuals on the basis of religion and national origin. Religious and national origin classifications are subject to strict scrutiny. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Where the evidence establishes that a government decision was made because of, not merely in spite of, a protected characteristic, Equal Protection is violated. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

152.     The pattern of discriminatory treatment here is not circumstantial. It is direct and cumulative. Before Plaintiff arrived, colleagues questioned whether she could speak English

based on her Pakistani name alone. After she arrived, her workplace communications were monitored at the direction of an administrator who was subsequently removed from supervisory authority for doing so. When she translated for South Asian families, the translations were regarded with suspicion, implied loyalties imputed to Plaintiff. When a Pakistani student drew a picture of her home country's flag, an Assistant Principal connected the event to Plaintiff's Muslim faith previous political speech by referencing Hamas in their next conversation. When Plaintiff objected to a directive that profiled immigrant students without consent, she was told by a supervisor that she did not have the audacity to object because she was not tenured. When a colleague misidentified her as Middle Eastern and she corrected it, she was disciplined for rudeness. When she filed a discrimination complaint, her years-old faith-based political speech was excavated and used against her. And when she was terminated, she was replaced by a white, non-Muslim woman who had previously worked as a teaching assistant, far less qualified than Plaintiff — a person who, by definition, had not been asked to profile immigrant students and had not refused.

153.    The Second Circuit recognizes that discrimination claims involving intersecting protected characteristics — here, Pakistani national origin and Muslim religion — must be analyzed as a whole rather than disaggregated into separate categories, because the combination may produce discrimination that would not exist on either basis alone. *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118 (2d Cir. 2004). A Pakistani Muslim woman faces a particular form of discrimination in post-October-7 America that is not reducible to either her national origin or her religion separately, and that is what the record in this case reflects.

154.    Defendants treated similarly situated non-Muslim, non-South-Asian counselors more favorably. The counselors who complied with the directive faced no adverse consequences.

Plaintiff's colleague Lopez, who is not South Asian or Muslim and who also refused the directive, was offered a transfer rather than terminated. Plaintiff's colleague Phillip, who also protested the directive, received no consequence at all. The harshest treatment, across every phase of this timeline, was consistently reserved for Plaintiff, the only Muslim and South Asian employee in the guidance department. Moreover, the pattern of retaliation directed against Plaintiff was not an isolated reaction to a single incident but a deliberate institutional response to protected refusal — one that had been rehearsed on Lopez before it was applied in full to Plaintiff, by the same actors, through the same mechanisms, culminating in progressively harsher consequences reserved exclusively for the most visibly Muslim and South Asian employee who refused.

155. The District is liable under *Monell* because Defendant Loper's termination of Plaintiff's employment constitutes an official policy act of the District's final policymaker, and because the Board's April 14, 2026 ratification vote institutionally adopted the discriminatory conduct.

156. Individual Defendants' conduct was intentional, malicious, or in reckless disregard of Plaintiff's federally protected rights, entitling her to punitive damages. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

157. As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered lost employment, lost wages and benefits, the loss of her tenure track and the professional security it represents, damage to her professional reputation in a specialized field, severe emotional distress including anxiety and depression for which she has sought medical treatment, and other economic and non-economic damages in amounts to be determined at trial.

**COUNT FIVE**
**42 U.S.C. § 1983 — Fourteenth Amendment Due Process**
**Liberty Interest — Stigma Plus**

*Against All Individual Defendants in Their Individual Capacities;*
*Against the District, Official Capacity Defendants Under Monell*

158.	Plaintiff repeats and re-alleges paragraphs 1 through 122 as if fully set forth herein.

159.	A public employee possesses a liberty interest, protected by the Due Process Clause, in her professional reputation and in the ability to pursue her chosen profession without government-imposed stigma. *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972). Where a government employer makes stigmatizing charges in connection with an employee's discharge, the employee is entitled to a name-clearing hearing. *Codd v. Velger*, 429 U.S. 624, 627 (1977); *Donato v. Plainview-Old Bethpage Central School District*, 96 F.3d 623, 630 (2d Cir. 1996). The Second Circuit has held that stigma-plus is established where the government makes public statements that are false, that damage the employee's reputation, and that are connected to a tangible deprivation of an employment interest. *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004).

160.	Defendants stigmatized Plaintiff in documented ways. She was physically escorted from the school building in view of students, parents, and colleagues, with her identification badge and laptop taken, without any explanation offered to the school community, leaving every person who witnessed her removal to draw the only reasonable inference available from the visible facts: that she had done something serious enough to require immediate removal. Her replacement arrived the same day she was removed — communicating to the school community that her departure was not voluntary, not routine, and not something the

50

District regretted. The January 6, 2026 complaint against her alleged that she had made false accusations in bad faith — a false and defamatory characterization of her conduct that was communicated to administrators, colleagues, and the investigative record. The termination charges, publicly cited in a letter to Plaintiff and transmitted through administrative channels, imputed professional incompetence and insubordination that the District's own investigation had already found were not substantiated. And as she continues her search for comparable employment, already a difficult task in the current job market, the District tells prospective employers, at the very least, that she is not eligible for rehire, a designation that was foisted on her unlawfully and that communicates incompetence or misconduct to the person asking for the reference.

161. Each of these stigmatizing acts was directly connected to Plaintiff's loss of her employment and her tenure track — the tangible deprivation that completes the stigma-plus claim. Plaintiff was never afforded a name-clearing hearing. She was never given the opportunity to publicly address the false implications that attached to her removal. The stigma followed her into the professional community in which she must now seek re-employment.

162. The professional harm flowing from Defendants' stigmatizing conduct is not abstract. The market for school counseling positions in Nassau County and the surrounding Long Island region is served primarily through public job posting systems, including the Online Application System for Educators ("OLAS") maintained by the New York State Education Department, through which prospective employers routinely verify employment history and contact prior supervisors. Valley Stream Central High School District's administration — the same administrators who are defendants in this action — constitute Plaintiff's primary professional references and the institutional source from which any prospective employer will

seek to verify her employment and the circumstances of her departure. The public manner of Plaintiff's removal from the building — escorted out in view of students, parents, and colleagues, with her identification badge and laptop taken, her replacement installed the same day — created a visible and memorable event in a school community whose members include parents, students, teachers, and staff who communicate within the broader professional and community networks through which Plaintiff must now seek employment. The school counseling profession in Nassau County is a specialized field with a limited number of positions and a professional community in which administrators across districts know one another. The circumstances of Plaintiff's departure, including the pretextual insubordination and performance charges in the March 23, 2026 termination letter, which were never adjudicated in any proceeding that afforded Plaintiff the opportunity to contest them, will follow her to every future application that requires disclosure of prior terminations or non-renewals, and to every reference check conducted by a prospective employer. Plaintiff was terminated without the procedural protections of a formal Education Law § 3020-a hearing, which is available only to tenured employees, meaning the false and pretextual grounds cited in her termination letter were never tested, rebutted, or adjudicated in any forum. Those grounds now exist in the District's official records and administrative correspondence as unrebutted findings, capable of being communicated to prospective employers in response to reference inquiries, and constituting a concrete and ongoing barrier to equivalent re-employment. Plaintiff has been applying for comparable positions since March 2026 without success. She has not been afforded a name-clearing hearing to address the false implications attached to her removal. The stigma Defendants created is not a temporary inconvenience. It is a professional disability imposed without process on a counselor

who had no prior disciplinary history and who was terminated for engaging in conduct the Constitution protects.

163. The District is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because Defendant Loper, as the District's final policymaker for employment decisions, directed and ratified the retaliatory conduct, and because the Board of Education's April 14, 2026 vote ratifying the termination constitutes institutional adoption of the challenged policy.

164. Individual Defendants' conduct was intentional, malicious, or in reckless disregard of Plaintiff's federally protected rights, entitling her to punitive damages. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

165. As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered lost employment, lost wages and benefits, the loss of her tenure track and the professional security it represents, damage to her professional reputation in a specialized field, severe emotional distress including anxiety and depression for which she has sought medical treatment, and other economic and non-economic damages in amounts to be determined at trial.

**COUNT SIX**
**Title VI of the Civil Rights Act of 1964 — Retaliation**
**42 U.S.C. § 2000d**

*Against the District, Official Capacity Defendants*

166. Plaintiff repeats and re-alleges paragraphs 1 through 122 as if fully set forth herein.

167. Title VI prohibits discrimination on the basis of race, color, and national origin in programs receiving federal financial assistance. 42 U.S.C. § 2000d. The District receives federal financial assistance including Title I funds and is subject to Title VI. The Supreme Court has

held that retaliation against a person who opposes Title VI discrimination is itself a form of intentional discrimination prohibited by Title VI, because it is impossible to prevent discrimination without protecting those who complain of it. *Jackson v. Birmingham Board of Education, 544 U.S. 167, 180 (2005)*.

168. Plaintiff opposed conduct she reasonably and in good faith believed constituted national origin discrimination against students in the District's federally funded educational programs. The MLE directive categorically targeted students based on their national origin and language background — the students who spoke Punjabi, Urdu, Spanish, and other non-English languages at home, the students from South Asian and Latin American immigrant families, the students in the ENL caseload — and applied to them, without prior or informed consent, a permanent academic designation reflecting presumed immigration vulnerability. This is facially discriminatory on the basis of national origin: it applied only to a subset of students defined by their foreign-language home environments, their immigration-connected family backgrounds, and their presence in an ENL program that tracked students by their countries of origin and language communities. No student whose parents spoke English at home was subjected to this program.

169. Plaintiff raised these concerns, in writing, to District administrators. She refused to participate in implementing the program in the manner directed. She arranged alternative academic pathways for some students so they would not be disadvantaged by the absence of an exemption they had not requested. These acts constitute protected opposition to conduct she reasonably believed violated Title VI's prohibition on national origin discrimination in federally funded programs.

170. The District retaliated against Plaintiff for this protected opposition by subjecting her to the full sequence of adverse employment actions described herein, culminating in her termination effective June 26, 2026.

171. As a direct and proximate result of the District's retaliation, Plaintiff has suffered the damages described herein. Pursuant to *Barnes v. Gorman*, 536 U.S. 181 (2002), punitive damages are not available against government recipients under Title VI. Plaintiff seeks compensatory damages, equitable relief, and attorneys' fees.

## COUNT SEVEN
## 42 U.S.C. § 1981 — Discrimination Based on Ancestry

*Via 42 U.S.C. § 1983 Against the District, Official Capacity Defendants Under Monell;
Directly Against All Individual Defendants in Their Individual Capacities*

172. Plaintiff repeats and re-alleges paragraphs 1 through 122 as if fully set forth herein.

173. 42 U.S.C. § 1981 guarantees all persons the same right to make and enforce contracts as is enjoyed by white citizens. In *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 613 (1987), the Supreme Court held that § 1981 protects individuals from discrimination based on ancestry and ethnic characteristics, including characteristics that are not tied to race in a strict biological sense. Courts in this Circuit and others have consistently held that persons of Pakistani and South Asian ancestry fall within the protection of § 1981 as a cognizable ethnic and ancestral group whose members have historically been subjected to purposeful discrimination. *See also Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18 (1987) (companion case applying same ancestral discrimination framework).

174. Plaintiff's employment with the District was a contractual relationship within the meaning of § 1981. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004) (§ 1981 claims arising from post-formation discriminatory contract impairment governed by 28 U.S.C. § 1658's four-year SOL).

175. Individual Defendants discriminated against Plaintiff on the basis of her Pakistani and South Asian ancestry throughout her employment, in all the respects described herein. They questioned, before her arrival, whether a person with her name could speak English. They scrutinized her student transcripts while she was out sick, digging for excuses to discipline her, and reviewed no other counselor's files. They interrogated her about her political speech concerning a Muslim-majority community and connected it to terrorism. They declined to identify her correctly by national origin and treated her correction of the misidentification as professional misconduct. They used the products of discriminatory surveillance as pretextual grounds to terminate her employment and replaced her with an underqualified white employee. They applied the same retaliatory playbook — surveillance, isolation, coordinated complaints, eventual removal, and replacement with a far less qualified trainee — to Plaintiff that Buonaspina had previously directed at Lopez, with materially harsher consequences reserved for the employee whose Pakistani and South Asian ancestry made her the most visible and vulnerable target. These acts, individually and collectively, constitute intentional discrimination against Plaintiff based on her Pakistani and South Asian ancestry in violation of § 1981.

176. Pursuant to *Jett v. Dallas Independent School District*, 491 U.S. 701, 736 (1989), § 1983 is the exclusive remedy for § 1981 violations against state actors in their official or municipal capacity. Plaintiff's § 1981 claim against the District is accordingly brought through §

1983, with the Monell allegations set forth above establishing municipal liability. The claim against individual Defendants in their individual capacities is brought directly under § 1981.

177. Section 1981 imposes no damages cap. Punitive damages are available against individual defendants who acted with evil motive or in reckless disregard of Plaintiff's federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Plaintiff seeks compensatory and punitive damages against individual Defendants, equitable relief, and attorneys' fees under 42 U.S.C. § 1988.

## DAMAGES APPLICABLE TO ALL COUNTS

178. As a direct and proximate result of the conduct described herein and the violations alleged in Counts One through Seven, Plaintiff has suffered and continues to suffer the following damages, the amounts of which will be determined at trial:

179. Lost wages and employment benefits from the date of her administrative removal on March 13, 2026 through the present and continuing, at an annual rate of approximately $100,000 to $105,000.

180. Lost future earning capacity, including front pay for the period during which Plaintiff's ability to obtain comparable re-employment is impaired by the stigma and professional harm described herein.

181. Loss of tenure-track credit accrued over approximately three years of probationary employment, which does not transfer between New York school districts and which Plaintiff must restart from zero at any new employer.

182. The concrete and ongoing barrier to re-employment created by the public circumstances of her removal from the building on March 13, 2026 — visible to students, parents, colleagues, and the broader school community — and by the unrebutted pretextual

insubordination and performance charges in the District's administrative record that will follow her to every future application requiring disclosure of prior terminations or non-renewals and to every reference check conducted by a prospective employer in the Nassau County school counseling market.

183. The loss of Valley Stream's administrators as professional references, those administrators being the defendants in this action, eliminating Plaintiff's ability to obtain references from the supervisors of her most recent three years of employment.

184. Severe emotional distress including anxiety and depression for which Plaintiff has sought medical treatment, caused by the discriminatory, retaliatory, and stigmatizing conduct described herein.

185. Damage to professional reputation in the specialized and geographically concentrated field of school counseling on Long Island, where the professional community is small, administrators across districts communicate regularly, and the circumstances of a departure from one district follow a counselor through subsequent applications.

186. Punitive damages against individual Defendants whose conduct was intentional, malicious, or in reckless disregard of Plaintiff's federally protected rights, in amounts sufficient to punish the conduct and deter its recurrence.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff Samia Tariq-Farooq respectfully requests that this Court enter judgment in her favor against Defendants and award the following relief:

A. A declaration that Defendants' conduct violated the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1981 and 1983, and Title VI of the Civil Rights Act of 1964;

B. Compensatory damages for lost wages, lost benefits, and lost future earning capacity in amounts to be determined at trial;

C. Compensatory damages for emotional distress, reputational harm, stigma, and professional damage in amounts to be determined at trial;

D. Punitive damages against individual Defendants under 42 U.S.C. §§ 1981 and 1983 in amounts to be determined at trial;

E. Equitable relief including but not limited to: reinstatement or front pay in lieu thereof; restoration of tenure-track status or equivalent tenure credit; a judicial declaration that the grounds cited for Plaintiff's termination were pretextual, retaliatory, and without legitimate basis; expungement of all adverse employment records, disciplinary findings, and termination charges from Plaintiff's personnel file and any other District records; and an order directing the District to provide Plaintiff with a neutral employment reference confirming her dates of employment, her position, and that her separation was not the result of any finding of misconduct or performance deficiency;

F. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

G. Pre-judgment and post-judgment interest; and

H. Such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues triable to a jury.

DATED: August 11, 2026            Respectfully submitted,

/s/ *Mahir S. Nisar*
MAHIR S. NISAR (NY #4788766)
mahir@nisarlaw.com
KIMBERLY NOE-LEHENBAUER (OK #34744)*
kimberly@nisarlaw.com

**NISAR LAW GROUP P.C.**
One Grand Central Place
60 E. 42nd Street, Suite 4600
New York, New York 10165
(212) 600-9534

*Attorneys for Plaintiff*


*\*Licensed in OK, not in NY. Practice limited to federal matters.*
*\*Application pro hac vice forthcoming.*

## VERIFICATION

I, Samia Tariq-Farooq, swear under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information, and belief.

_____
Samia Tariq-Farooq, Plaintiff

7·31·2026
_____
Date